IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARVIN L. GOREE,                                    Civil No. 02-1433-CO

        Petitioner,                    FINDINGS AND RECOMMENDATION

        v.

JAMES BARTLETT,

        Respondent.

COONEY, Magistrate Judge:

Petitioner brings this habeas corpus proceeding pursuant to 28 U.S.C. § 2254. In his amended petition for writ of habeas corpus (#38), petitioner raises claims for violation of his rights against self-incrimination and due process, ineffective assistance of trial counsel, and due process and equal protection.

## I. <u>BACKGROUND</u>

Following trial, petitioner was convicted of Kidnapping in the First Degree, in Multnomah County Circuit Court Case No. C94-11-37927, and Felony Murder (two counts), Burglary in the First Degree (two counts), Robbery in the First Degree, and Manslaughter in the First Degree, in Multnomah County Circuit Case No. C95-01-30442. Petitioner was sentenced to a 130-month

prison term on the Kidnapping conviction, a 224-month prison term on the merged Murder and Burglary convictions, a 36-month prison term on the Robbery conviction, and a 60-month prison term on the Manslaughter conviction; the court ordered that the sentences on the Kidnapping conviction (Case No. C94-11-37927) and Robbery and Manslaughter convictions (Case No. C95-01-30442) be served consecutively, and the remaining sentences be served concurrently. (Ex. 101.)

Petitioner directly appealed his convictions to the Oregon Court of Appeals. The Oregon Court of Appeals affirmed in a written opinion, State v. Goree, 151 Or. App. 621 (1997), and the Oregon Supreme Court denied review, State v. Goree, 327 Or. 123 (1998). (Exs. 103-108.)

Petitioner filed a petition for post-conviction relief in Marion County Circuit Court, Case No. 98C16637. (Exs. 109-119.) The post-conviction court denied relief. (Exs. 120-122.) Petitioner appealed the denial of post-conviction relief to the Oregon Court of Appeals, but the Court of Appeals granted summary affirmance. (Exs. 123-124.) The Oregon Supreme Court denied review. (Ex. 126-127.)

## II. DISCUSSION

In his amended petition for habeas corpus relief, petitioner raises the following claims for relief:

> A. Ground One: Petitioner's rights against compelled self-incrimination and to due process of law under the Fifth and Fourteenth Amendments to the U.S. Constitution, were denied by the state trial court, when it admitted his inculpatory statements, which were involuntarily obtained by the State.
> Supporting facts: Petitioner alleges that the State's agent, his girlfriend, Kimla Dobbins, coerced and covertly recorded his admissions during repeated interviews at the jail where he was confined for allegedly kidnaping her. Her coercion, included promises to drop the kidnaping charges and to marry Mr. Goree if he admitted committing the homicide and threats that she would immediately leave him and never return if he did not confess. These threats and promises overbore his freewill where he was a borderline mentally retarded, paranoid schizophrenic

who was highly dependent upon Ms. Dobbins and faced a lengthy term of imprisonment on the kidnaping and related charges.

B.  Ground Two:  Petitioner was denied adequate and effective assistance of trial counsel in violation of the Sixth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 11, of the Oregon Constitution in one or more of the following particulars:

Supporting facts:  Trial counsel failed to conduct an adequate and reasonable investigation into the facts of the case when he failed to interview witnesses crucial to the defense which would have established an alibi for petitioner at the time of the homicide.

C.  Ground Three:  Petitioner was denied adequate and effective assistance of trial counsel in violation of the Sixth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 11, of the Oregon Constitution in one or more of the following particulars:

Supporting facts:  Trial counsel failed to subpoena petitioner's alibi witness to testify for the defense as to petitioner's whereabouts on the date of the homicide.

D.  Ground Four:  Petitioner was denied adequate and effective assistance of trial counsel in violation of the Sixth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 11, of the Oregon Constitution in one or more of the following particulars:

Supporting facts:  Trial counsel failed to adequately impeach the state's witnesses on the grounds that they made a deal to testify against petitioner in exchange for the dismissal of pending criminal charges and the fact that one of the witnesses was in possession of the victim's property.

E.  Ground Five:  Petitioner was denied due process and equal protection of the law in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States and Article I, Sections 11 and 20, of the Oregon Constitution in one or more of the following particulars:

Supporting facts: Petitioner believes and alleges that his continued imprisonment and restraint is illegal and in violation of OR. REV. STAT. 138.530(1)(a) depriving him of due process and equal protection of the law in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 11 and 20 of the Oregon Constitution in one (1) or more of the following particulars: (1) the prosecution failed to disclose a copy of a 91 1 tape of a telephone call made by one of the state's key witnesses; and (2) the trial court imposed a sentence which did not take petitioner's individual circumstances and rehabilitation potential.

(Am. Pet. at 5-7.)

In his brief in support of amended petition, petitioner addresses ground one only.  Petitioner

has not addressed grounds two through five of his amended petition. The court finds that any ground not addressed in petitioner's brief in support of his petition is deemed waived and should be dismissed. See Von Berckefeldt v. Hall, Civil No. 02-927-CO, Order adopting Findings and Recommendation (D. Or. June 28, 2005) (claims not addressed in memorandum in support of petition for writ of habeas corpus deemed waived); Simmons v. Schiedler, Civil No. 03-644-CO, Order adopting Findings and Recommendation (D. Or. April 22, 2005) (same); Bischoff v. Lampert, 02-787-CO, Order adopting Findings and Recommendation (D. Or. April 20, 2005) (same); Wildin v. Thompson, Civil No. 99-204-CO, Order adopting Findings and Recommendation (D. Or. Nov. 5, 2003) (same).

Accordingly, only petitioner's ground one will be addressed by the court.

The Antiterrorism and Effective Death Penalty Act (AEDPA), which revised the standards of deference federal courts must accord state court decisions, provides in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d). Further, any factual determinations made by the state courts are presumed to be correct. Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

Under section 2254(d)(1), a state prisoner may obtain federal habeas corpus relief with

respect to a claim adjudicated on the merits in state court only if the state court's ruling was either (1) contrary to clearly established federal law, as determined by the Supreme Court of the United States, or (2) involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States. Williams v. Taylor, 529 U.S. 362, 404-05 (2000); Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2004), petition for cert. filed, ___ U.S.L.W. ___ (U.S. July 26, 2005) (No. 05-5565). These clauses have independent meanings, but in some cases they may overlap. Williams, 529 U.S. at 408; Van Tran v. Lindsey, 212 F.3d 1143, 1150 (9th Cir. 2000), overruled on another ground by Lockyer v. Andrade, 538 U.S. 63 (2003).

"The threshold question under AEDPA is whether [petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." Williams, 529 U.S. at 390. When determining what the clearly established federal law is, federal courts look at the holdings of the United States Supreme Court as of the time of the state court's decision. Id. at 412. Ninth Circuit law may still be considered "for its persuasive authority in applying Supreme Court law." Van Tran, 212 F.3d at 1154; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.), cert. denied, 540 U.S. 968 (2003). "The state court need not cite or even be aware of the governing Supreme Court cases, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" Powell v. Galaza, 328 F.3d 558, 563 (9th Cir. 2003) (quoting Early v. Packer, 537 U.S. 3 (2002), reh'g denied, 537 U.S. 1148 (2003)).

A state court's decision is "contrary to" clearly established Supreme Court precedent if 1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or 2) the state court "confronts a set of facts that are materially indistinguishable" from a Supreme Court case, but still reaches a different result. Williams, 529 U.S. at 405-06, 412-13;

Lockyer v. Andrade, 538 U.S. 63, 73 (2003); Clark, 331 F.3d at 1067. A state court's ruling is "contrary to" Supreme Court precedent if it is diametrically different, opposite in character or nature, or mutually opposed to, a Supreme Court holding. Williams, 529 U.S. at 405.

A state court decision involves an "unreasonable application" of Supreme Court precedent if 1) the state court identifies the correct governing rule, but then applies it to a new set of facts in an unreasonable way, or 2) the state court either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. Id. at 407-09; Wiggins v. Smith, 539 U.S. 510, 520 (2003); Clark, 331 F.3d at 1067. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . . [A]n *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law."[1] Williams, 529 U.S. at 409, 412; Lockyer, 538 U.S. at 75, 76; Wiggins, 539 U.S. at 520; Clark, 331 F.3d. at 1067-68. Thus, a federal court may not issue a writ even when it concludes, based on its independent judgment, that the state court, in reaching its decision, applied clearly established federal law erroneously or incorrectly. Williams, 529 U.S. at 412-13; Lockyer, 538 U.S. at 76; Woodford v. Visciotti, 537 U.S. 19, 24, 27 (2002), reh'g denied, 537 U.S. 1149 (2003). At a minimum, the objectively unreasonable standard denotes

---

[1] Petitioner contends that a state court's decision is an "unreasonable application" of clearly established federal law when the court's independent review of the legal question leaves the court with a firm conviction that clear error occurred, citing Van Tran v. Lindsey, 212 F.3d 1143, 1153-54 (9th Cir. 2000). However, the Supreme Court in Lockyer, 538 U.S. at 75-76, determined that the Ninth Circuit in Van Tran erred in its "unreasonable application" analysis when it defined "objectively unreasonable" to mean "clear error." (Citing Williams, 529 U.S. at 411; Bell v. Cone, 535 U.S. 685, 699, reh'g denied, 536 U.S. 976 (2002); see Clark, 331 F.3d at 1067-68.

a great degree of deference to the state court. <u>Clark</u>, 331 F.3d at 1068. "'[T]he only question that matters under § 2254(d)(1),' <u>Lockyer</u>, 123 S. Ct. 1171, is whether or not the [] state court's decision is contrary to, or involved an unreasonable application of, clearly established Federal law." <u>Id.</u> at 1069.

Under section 2254(d)(2), a state prisoner may obtain federal habeas corpus relief with respect to a claim adjudicated on the merits in state court only if the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Factual determinations by state courts are presumed correct in the absence of convincing evidence to the contrary. <u>Miller-El</u>, 537 U.S. at 340. "A state court decision 'based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding.'" <u>Davis</u>, 384 F.3d at 638 (quoting <u>Miller-El</u>, 537 U.S. at 340).

In this case, the court looks to the decision of the Oregon Court of Appeals as "the last reasoned decision" as the basis of the state court's judgment. <u>Franklin v. Johnson</u>, 290 F.3d 1223, 1233 n.3 (9th Cir. 2002); <u>Powell</u>, 328 F.3d at 563; <u>Shackleford v. Hubbard</u>, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

In support of his petition for relief, petitioner contends that he is a mentally limited paranoid schizophrenic and was emotionally and otherwise dependent on Kimla Dobbins, and because Ms. Dobbins induced him to confess to murder by promising to marry him; promising to drop the kidnapping charges upon which he was jailed; and threatening that if he did not confess, she would walk out of his life forever, his statements were involuntary and should have been suppressed. He contends that the state court's denial of his motion to suppress is not entitled to deference because

it is either contrary to, or an unreasonable application of, Supreme Court law barring involuntary confessions. He further contends that the erroneous admission of his involuntary statements is not harmless error. In response to petitioner's amended petition, respondent contends that the state court's denial of petitioner's claim is entitled to deference and, any error, if it occurred, was harmless.

Relying on Blackburn v. Alabama, 361 U.S. 199, 208 (1960), the Ninth Circuit has stated that, "An inculpatory statement is voluntary only when it is the product of a rational intellect and a free will." United States v. Leon Guerrero, 847 F.2d 1363, 1365 (9th Cir. 1988); Mincey v. Arizona, 437 U.S. 385, 398 (1978). The test whether an inculpatory statement is voluntary is whether, considering the totality of the circumstances, the statement was obtained by physical or psychological coercion or by improper inducement so that "the defendant's will was overborne at the time he confessed." Haynes v. Washington, 373 U.S. 503, 513 (1963); Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); Mincey, 437 U.S. at 401-02; Leon Guerrero, 847 F.2d at 1366 (and cases cited). The Ninth Circuit in Leon Guerrero stated:

> A statement is involuntary if it is "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however, slight [or] by the exertion of any improper influence. This broadly-stated rule has not been applied to invalidate, per se, all statements made by a suspect in response to a promise made by law enforcement personnel. The promise must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances.

847 F.2d at 1366 (quoting Hutto v. Ross, 429 U.S. 28, 30 (1976)); other citations omitted). Factors to be considered in assessing the totality of the circumstances include such circumstances as age, low intelligence, lack of education, length of detention, and the use of physical punishment. Schneckloth, 412 U.S. at 226 (and cases cited); Colorado v. Connelly, 479 U.S. 157, 167 (1986) (mental condition). The Court has also found that the use of a friend of a criminal defendant's to

obtain a confession is a factor to be considered. Arizona v. Fulminante, 499 U.S. 279, 286 n.2 (1991); Spano v. New York, 360 U.S. 315, 323 (1959). No one factor is determinative, but must be considered in light of "all the surrounding circumstances–both the characteristics of the accused and the details of the interrogation." Schneckloth, 412 U.S. at 226-27. "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Connelly, 479 U.S. at 167; Derrick v. Peterson, 924 F.2d 813, 817-18 (9th Cir. 1991). The voluntariness of a defendant's statements must be proved by the government by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 489 (1972); Leon Guerrero, 847 F.2d at 1365.

Petitioner contends that the state court's decision is contrary to federal law because the court did not consider any federal authority as to the voluntariness issue. He contends that, assuming that the Oregon Court of Appeals applied the correct federal law, the application was unreasonable: he contends that the state court failed to meaningfully apply the totality of the circumstances test because the court failed to consider the salient circumstances–his psychiatric condition, his extreme dependence on Ms. Dobbins, and the interrelation of those factors to Dobbins' threat to leave him if he did not confess and her promise to marry him if he did confess. He contends that the state exploited a paranoid schizophrenic's dependence on his girlfriend and, using promises, threats, and lies, the state overbore his will and obtained his involuntary confession. Respondent contends that the state court applied federal constitutional standards and its decision is not objectively unreasonable.

The statements at issue were made by petitioner on December 10, 1994, and December 17, 1994, when Ms. Dobbins, who was wearing a concealed recording device, visited petitioner in jail

where he was being held on the kidnapping charge.  (Suppl. Exs. 129, 130.)  Pertinent excerpts are

included in the Court of Appeals opinion, 151 Or. App. at 624-28.[2]

_____

[2]  The Court of Appeals set forth the following pertinent portions of the taped statements:
Dobbins met with defendant in the visitor rooms at the jail. The visitor rooms
consisted of two rooms separated by a plexiglass window; the two communicated
by phones.  At the first meeting, Dobbins explained to defendant that she wanted
"to start fresh. I want us to start over."  She said that the only way to do that "is to
clean the slate."  She then asked defendant about the McDonald  killing:

"Dobbins:  Okay, now, um. I wanna know, uh. 'Member that house
you took me by?
"[Defendant]:  What house?
"Dobbins:  That house.
"[Defendant]:  Where?
"Dobbins:  I don't know, over there by . . .
"[Defendant]:  Where you left me.
"Dobbins:  Noooo, over there by the Plaid Pantry.
"[Defendant]:  (unintelligible)
"Dobbins:  'Member when you made me drive by over there?
"[Defendant]:  Hm, hm, tell me.
"Dobbins:  I wanna know what happened.
"[Defendant]:  (unintelligible-whisper)
"Dobbins:  What?
"[Defendant]:  (unintelligible whisper)
"Dobbins:  They can't hear nothin' on these phones.
"[Defendant]:  What house?
"Dobbins:  That house.
"[Defendant]:  What house?
"Dobbins:  You know what house.
"[Defendant]:  Why (unintelligible).
"Dobbins:  What?  Well you're gonna have to tell me the truth.
"[Defendant]:  Who's trying to get me, the police?
"Dobbins:  No, they're not.
"[Defendant]:  They is!
"Dobbins:  They never even brought that up to me.
" * * * * *
"[Defendant]:  What are you talking about?
"Dobbins:  I'm talking about that guy's house that you told, that you
took me by over here, by Mike's.
"[Defendant]:  (unintelligible)
" * * * * *
"Dobbins:  'Member when, wait. Pick up the phone.

"[Defendant]:  (unintelligible) Dead.

"Dobbins:  Dead. He's dead?

"[Defendant]:  Shut up.

"Dobbins:  Nobody can hear me * * *.

" * * * * *

"[Defendant]:  N'kay.  Well I wanna know.  Well I need to know
the truth about some things bef-fore we stay . . .

"[Defendant]:  (unintelligible)

"Dobbins:  . . . together.

"[Defendant]:  . . . I can't tell you about that babe!  All right?  That
right there, I don't know what happened. Okay?

"Dobbins:  Well.

"[Defendant]:  I told you what I did, okay?"

The conversation shifted to other matters, including Dobbins's children,
defendant's need for money and his need for help in getting a California parole
hold lifted.  At that point, defendant raised the subject of Dobbins's continued
fidelity:

[Defendant]:  Let me see your neck.

"Dobbins:  Ohhh, look. I'm not gonna sit here and go through that.
No.  I'm not gonna sit here and go through that, that's re-, that's
totally ridiculous.  Let me see yours.  Look at that hickey right
there. (laughs) Mo.  Look.  Okay?  I'm not doin' nothin', okay?
Obviously I still love ya.  I'm here.

"[Defendant]:  (unintelligible)

"Dobbins:  I didn't press no charges, did I?  On noth', none of that.
'Kay?  So what does that tell you?  It's the same thing as always . . .

"[Defendant]:  Hey, hey . . .

"Dobbins:  . . . I'm, um, always tried to help you baby."

Dobbins eventually returned to the subject of McDonald's killing, and defendant
said that he and two other men went to McDonald's house because they had heard
that McDonald had "10 birds. 10 fuckin' keys, okay?"  He explained that they did
not get anything and that, although they gave McDonald a bloody nose, McDonald
was standing when they left.

At the second meeting, Dobbins told defendant that she had talked to the two
other men who were with defendant at McDonald's house and that they told her a
different story about the incident than defendant had told her.  She also mentioned
that she had read the newspaper article about the killing and wanted a further
explanation from defendant:

"Dobbins:  Listen.  You're gonna tell me and you're gonna tell me
the truth.  And I'm gonna know if it's the truth or not.

"[Defendant]:  (inaudible)

 

"Dobbins: Because, I've already talked to the couple of people. You're gonna tell me the truth or I'm gonna get up and I'm gonna walk out of here and you're never gonna see me again and I'm not gonna help you do shit.

"[Defendant]: Just wait mama.

"Dobbins: 'Kay?

"[Defendant]: What?

"Dobbins: Now you tell me exactly what you did to that man.

"[Defendant]: I told you mama.

"Dobbins: No you didn't.

"[Defendant]: I told you all I did was beat the man up babe and take some dope. That's all. Okay?"

The conversation veered to other matters. Eventually, defendant said that he wanted to marry Dobbins. She replied that she did not want to marry him, because he was not telling her the truth. At that point, defendant emphatically demanded that Dobbins listen to him carefully:

"[Defendant]: . . . Let me tell you what I did.

"Dobbins: Yes.

"[Defendant]: I went in and man he came outside to feed the cat . . .

"Dobbins: (cleared throat).

"[Defendant]: . . . And I grabbed him the motherfucker, ran him inside . . .

"Dobbins: Um-hm.

"[Defendant]: . . . body slammed his ass.

"Dobbins: Um-hm.

"[Defendant]: Banged him two, three times."

Dobbins asked defendant how McDonald died, and defendant replied that he did not know. He then asked Dobbins to call the California parole authorities and questioned whether Dobbins had reunited with a former boyfriend. Dobbins turned the conversation back to the McDonald killing. She told defendant that she thought that he had beaten McDonald more seriously than defendant had earlier described:

"Dobbins: What did you slam his head on?

"[Defendant]: Nuttin'. Nuttin' there.

"Dobbins: Well what did you do that for then?

"[Defendant]: I slammed him on the floor.

"Dobbins: You slammed him on the floor?

"[Defendant]: Yeah, uh. Hey, believe me, okay? Will you do that? All right . . .

"Dobbins: Well I'm havin' a hard time believing you.

"[Defendant]: Shit. You know you got me startin' to think maybe

It is clear from a review of the record that the trial court and court of appeals were aware of petitioner's mental and emotional limitations, and the personal relationship between Ms. Dobbins and petitioner, and the effect of these circumstances on the voluntariness of petitioner's statements to Dobbins. See Ex. 103 at App-34 - App-35, App-36, App-39; Ex. 105 151 Or. App. at 628-29, 633-34). Acknowledging petitioner's limitations, the courts found that petitioner controlled much of the conversations with Dobbins; he knew that he had an option not to talk with her about the McDonald homicide; and he knew that if he refused to speak, the police could take no action against him. (Ex. 103 at App-38 - App-39; Ex. 105 151 Or. App. at 633.) The Court of Appeals specifically found that there was "no evidence that [petitioner] actually understood that his statements would purchase leniency of any sort, or that he actually relied on Dobbins' implied promise with respect to the kidnapping charges in speaking with her about the murder." Goree, 151 Or. App. at 634; see Ex. 103 at App-38 - App-39. The Court of Appeals went on to find that

---

you investigating somethin' or gonna go do something.
"Dobbins: I'm not gonna do nothing, okay. I just wanna know the truth. If I'm gonna stay with ya, I'm gonna marry you.
"[Defendant]: I'm askin' ya dear.
"Dobbins: I'm gonna marry you, I wanna know the whole truth about this before I get any further along in my life with you.
"[Defendant]: Okay. I'm telling you, your baby didn't do it. Now can you believe me?
"Dobbins: I don't believe you for some reason, I just think there's just a little bit more to it.
"[Defendant]: Mama. If I did it, I'd tell you I did it.
" * * * * *
"Dobbins: I'm not sayin that you killed him, okay? I'm just sayin that you beat him up real bad.
"[Defendant]: Babe, I might of beat him up babe. I only hit the motherfucker three or four times, I didn't beat him up. I only hit (unintelligible) the big white boy, eh, eh, up here one time baby, knock him down. Dropped him to his knees."

Goree, 151 Or. App. at 623-28.

Findings and Recommendation - 13

petitioner's arguments on this issue rested on the "speculation that he could have so understood and relied on Dobbins's statements and that, in light of his relative lack of intelligence, [the court] should assume that he did." Id. The court found that such speculation and assumptions were not consistent with its standard of review. Id. The court also found that petitioner did not explain and the record did not reveal "how the threat of breaking off a romantic relationship was so powerful an inducement to [petitioner] that his will was overborne and his capacity for self-determination was critically impaired." Id. The court found that, in light of the trial court's finding that, at all times, petitioner was well aware that he did not need to talk to Dobbins, it was unpersuaded by the argument. The Court of Appeals concluded that, "Under the totality of the circumstances, therefore, the trial court was correct in concluding that the state carried its burden of demonstrating, by a preponderance of the evidence, that defendant made the admissions to Dobbins voluntarily." Goree, 151 Or. App. at 634.

The state courts' findings are consistent with Supreme Court precedent which holds that petitioner's characteristics and the details of the interrogation should be considered and that no one factor is determinative, but must be considered in the totality of circumstances. Schneckloth, 412 U.S. at 226-27; Connelly, 479 U.S. at 164, 165 (mental condition).

Petitioner first contends that the state court's decision is contrary to federal law because the court did not consider any federal authority as to the voluntariness issue. However, "The state court need not cite or even be aware of the governing Supreme Court cases, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" Powell, 328 F.3d at 563 (quoting Early v. Packer, 537 U.S. 3 (2002), reh'g denied, 537 U.S. 1148 (2003)). In setting forth the standard on voluntariness of statements, the Oregon Court of Appeals stated that, "A statement was

made voluntarily if, under the totality of the circumstances, it is apparent that 'defendant's will was not overborne and his capacity for self-determination was not critically impaired.'" State v. Goree, 151 Or. App. 621, 631 (1997) (quoting State v. Vu, 307 Or. 419, 414-25 (1989)). The Vu court cited the United States Supreme Court case of Schneckloth, 412 U.S. at 225-26, supra, in support of its statement. The Court of Appeals stated that the voluntariness of a statement must be proved by the state by a preponderance of the evidence. Goree, 151 Or. App. at 631 (citing State v. Stevens, 311 Or. 119, 135-37 (1991)). The Stevens court cited the United States Supreme Court cases of Lego, 404 U.S. 477, supra, and Connelly, 479 U.S. 157, supra, in support of its statement. Although Supreme Court authority was not directly cited by the state court, it's statement of the standard applicable to voluntariness of statements does not contradict Supreme Court precedent. Nor, based on the foregoing, does the state court' s decision as to the voluntariness of petitioner's statements contradict Supreme Court precedent. Moreover, federal law was cited by petitioner in support of his arguments in the Court of Appeals, and he argued to the court that the analysis under the Oregon statute and the Oregon and federal constitutions was "essentially the same," Goree, 151 Or. App. at 629 n.1; he cannot now argue that the court's failure to cite federal law is a reason to find that the court's decision is contrary to federal law. On the ground raised by petitioner, the court cannot find that the state court's decision is contrary to federal law.

Nor, on this record, can the court find that the state court's decision is an unreasonable application of clearly established federal law on the issue of the voluntariness of statements made by a criminal defendant.

Plaintiff also argues in his memorandum that the state ignored applicable ethics rules in circumventing his right to counsel. He asserts that his "argument based on the disciplinary rules is

yet another circumstance that counseled for suppression." (Pet'r Mem. at 19.) This basis was not included in ground one of petitioner's amended petition and will not be considered by the court.

Petitioner contends that the admission of his involuntary statements is not harmless error because his statements to Dobbins and her testimony about them provided the case against him. Respondent contends that any error is harmless because there was other substantial evidence that petitioner committed the murder.

The Ninth Circuit applies the harmless error standard enunciated in <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993), to all federal habeas corpus cases under § 2254, rather than the harmless error standard of <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967). <u>Bains v. Cambra</u>, 204 F.3d 964, 977 (9th Cir. 2000). Under the <u>Brecht</u> harmless error analysis, constitutional errors warrant habeas relief "only if 'in light of the record as a whole,' the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" <u>Laboa v. Calderon</u>, 224 F.3d 972, 977 (9th Cir. 2000) (quoting <u>Brecht</u>, 507 U.S. at 638). Thus, a habeas petitioner must establish that the error "'resulted in "actual prejudice"'" to be entitled to habeas relief. <u>Id.</u> (quoting <u>Brecht</u>, 507 U.S. at 637).

At trial, Dobbins testified to statements petitioner made to her prior to the taped statements. A couple of days after petitioner took her and her children to Mike Harris' house from Vancouver around the first week of November, (Tr. 301-02, 307), petitioner told her that he had "hurt somebody" and "didn't know how bad," (Tr. 303, 307-08). Petitioner was "a little scared" about how badly he had hurt the person. (Tr. 303.) When he first brought up the subject, petitioner told Dobbins that he had gone over there and "watched and waited for the guy." (Tr. 304.) He told her that "The guy came out to get his cat and that's when he grabbed him and drug him in the house and beat him up." (Tr. 304.) He wanted to drive Dobbins by the house; they drove by the house at 1532

N. Blandena and said "'That's the house that it happened at.'" (Tr. 304-05, 306.) Petitioner told Dobbins to write down the address; she did so and, at trial, produced a piece of paper on which she had written the address. (Tr. 306.) Petitioner brought up the subject at least two times. (Tr. 304-05, 307.)

In mid-November, Dobbins noticed that petitioner had procured some drugs and was selling cocaine and making money. (Tr. 313.)

Petitioner told Dobbins' son, Brian Herns, after petitioner had picked them up in Vancouver and brought them to Mike's, that he wanted to get some money to get them into a house. (Tr. 288-89.) Later, petitioner hold him "he had got some money and that he had hurt some guy real bad but he didn't know how bad he hurt him." (Tr. 289, 290.) Petitioner told Herns it was up the street from Mike's house. (Tr. 289.) Petitioner told him he had "hurt him bad" and "doesn't know if he killed him or not." (Tr. 289.) He made similar statements to him two to three times. (Tr. 289.)

Petitioner knew Mike Harris and lived at Harris' home with Dobbins and the children two to three weeks before November 18-19. McDonald visited Mike Harris at his home, and Harris considered McDonald to be a friend. (Tr. 190-91.)

Blaine Ross met petitioner approximately three days before McDonald was murdered. (Tr. 205, 211, 212.) Petitioner came by McDonald's house with some deodorant and other items and Ross gave him a piece of crack for the items. (Tr. 212.) Two to three days before McDonald died, Ross saw petitioner walk past McDonald's house, and then stand across the street looking at the house. (Tr. 212-13, 254.) Ross saw him out there a couple of days. (Tr. 213.) When Ross saw petitioner before McDonald's death, petitioner was wearing a black hood with a jacket, and a white cap "sticking out in front." (Tr. 230.) Ross' girlfriend also had seen a man–meaning

petitioner–across the street.  (Tr. 213.)

On October 30, petitioner called McDonald's house from Harris' house and asked to buy a $10 rock from Elvis Parker, Ross' brother.  Parker told him he didn't sell cocaine in such small quantities. (Tr. 205, 246, 250-53.) Petitioner threatened to rob Parker and McDonald. (Tr. 250-51.) Parker went to Harris' house but petitioner had already gone.  (Tr. 253.)  Previously, on October 28 or 29, petitioner had told Parker he would rob him.  (Tr. 250-51.)

On the evening of October 30, Ross' girlfriend drove to McDonald's house.  She saw petitioner standing across the street from McDonald's house looking at the house.  (Tr. 270.) Petitioner had on a black sweatshirt with a hood over his head.  (Tr. 270.)  Because petitioner was standing across the street and looking at McDonald's house, she didn't know what to expect and thought petitioner could be a rapist, so she honked the horn.  Ross and McDonald came out of the house, but petitioner had left.  (Tr. 271.)

On October 30, a neighbor was home from 5:00 in the evening to 2:00, and watched the neighborhood and what was going on in the neighborhood because there was lot of foot traffic.  At about 2:00 in the morning he saw something that caused him to go to the edge of McDonald's property.  The porch light was on at McDonald's house and he saw McDonald walk out onto the front porch, look both ways, shook out a carpet, looked both ways, and walked in through the front door; just as he got through the door, a person described as an Hispanic, in blue jeans and a red or orange jacket, "at an absolute dead run, runs in behind [McDonald] and the front door of that house slammed so hard,  you could hear the house shake." (Tr. 111-14,)  He did not recognize the person as one he'd seen before.  (Tr. 119-20.)

Ross and his girlfriend returned to McDonald's house in the early morning hours after being

gone a couple of hours. They saw that the house had been ransacked. They called the police and gave them McDonald's address. (Tr. 222-24; 274-76.) Ross went back to McDonald's house the next morning and found McDonald dead. (Tr. 227-28, 255-56; 270.) Police were called. (Tr. 229.)

The autopsy showed that McDonald had been beaten, gagged, and hog-tied. (Tr. 124.) He suffered from a total of sixty-eight individual fresh bruises or abrasions. (Tr. 127.) He has six fractured ribs. (Tr. 128.) McDonald died from asphyxia, or an inability to breath, caused in part from being hog-tied face down with broken ribs, a broken nose that was bleeding, and being gagged with a bloody, wet shirt. (Tr. 128-29.) Additionally, one of his head injuries was potentially life-threatening. (Tr. 129.) The doctor could not tell whether McDonald had been hit with a broad object or whether his head had been slammed into a very broad object. (Tr. 130.)

Parker saw petitioner on Halloween, October 31, at Harris' house. By the time Parker saw petitioner that day, he knew that McDonald had been killed. (Tr. 255.) When Parker saw petitioner, petitioner was wearing a black pullover sweatshirt with a hood on it and a white baseball cap. (Tr. 255.) Parker saw a bloodstain on petitioner's baseball cap, that looked like petitioner had put his hat on his head and left his fingerprints on the hat and had wiped his hand on his shirt; "and his tennis shoes also had blood on it [sic] too, you know." (Tr. 256-57.) Parker believed petitioner had killed his friend, and offered to buy the hat from him, but petitioner refused. (Tr. 257.) Parker saw petitioner sitting, and petitioner hit the pavement and heard petitioner say "'I forgot to search the fucking drawers.'" (Tr. 258.)

On November 20 or 21, when police questioned petitioner about Dobbins' kidnapping, they noticed petitioner had a tattoo depicting boxing gloves. Petitioner told the officers that he was a "real good boxer" and had had twenty-nine wins and seven losses, and he had won seventeen of the

matches by TKO. (Tr. 158.) On about December 1, petitioner told police that "if he was going to take something from someone, he would bust the person's face up[,] . . . 'tie him up' and then take everything." (Tr. 178-79.) No questions were asked about McDonald's death. (Tr. 179.)

During the murder investigation, on January 1, police interviewed petitioner. He told them he had purchased "dope" at "that house" before, clarified by Detective Hill as 1532 N. Blandena. (Tr. 180.) Petitioner denied pointing out 1532 N. Blandena to Dobbins; he said he didn't know how she got the address and didn't think that it was Dobbins' handwriting. (Tr. 181, 183.) Later, he called Detective Hill from jail and told her he remembered taking Dobbins by the house in question–1532 N. Blandena–and she may have written down the address. (Tr. 184-85.) He acknowledged the writing on the paper was Dobbins'. (Tr. 186.)

Petitioner testified at trial and was impeached with prior convictions, including three convictions for burglary; drug convictions from 1980, 1982, and 1990; a conviction for assault to commit rape in 1988; and a conviction for grand theft from a person in 1992. (Tr. 384-85.)

The prosecutor made references to the taped statements petitioner made to Dobbins while he was jailed, during opening argument, (Tr. 78-79), and referred to them in closing argument and rebuttal argument, (Tr. 441-47, 475-78).

On this record, petitioner has not established that the admission of the taped statements actually prejudiced him. In his closing statement, and again on rebuttal, the prosecutor went through all of the evidence presented in detail, including the statements made to Dobbins which she recorded, sometimes quoting portions of the tapes. The court does not believe that undue emphasis was placed on the taped statements over other evidence presented in the case. The court finds that, considering the record as a whole, even if the state court erred in allowing petitioner's jailhouse statements to

Dobbins to be admitted at the murder trial, any error was harmless because it did not have a substantial and injurious effect or influence in determining the jury's verdict.

Petitioner has not come forward with clear and convincing evidence to rebut the presumption of correctness accorded the state court's determination of factual issues. On this record, the court finds that the decision of the state courts was neither contrary to, nor an unreasonable application of, Supreme Court law, as argued by petitioner, so as to warrant habeas relief. Further, even if the state court erred in allowing petitioner's jailhouse statements to Dobbins in his murder trial, on the record as a whole, any error was harmless. Accordingly, petitioner is not entitled to relief on the ground that his statements to Ms. Dobbins were involuntary.

## III. <u>RECOMMENDATION</u>

Based upon the foregoing, it is recommended that the amended petition for writ of habeas corpus be denied and this case dismissed; and that judgment be entered denying the amended petition for writ of habeas corpus and dismissing this case with prejudice.

***<u>This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals</u>***. **Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order.** ***<u>The parties shall have ten days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties have ten days within which to file a response to the objections</u>***. **Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the**

**Magistrate Judge's recommendation.**

DATED this __22___ day of  August, 2005.

_____/s/_____
UNITED STATES MAGISTRATE JUDGE